CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 20 2014

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CANDACE JOY HICKS, | ) |
| | ) Civil Action No. 7:12-cv-618 |
| Plaintiff, | ) |
| | ) **MEMORANDUM OPINION** |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN,[1] | ) Hon. James C. Turk |
| Acting Commissioner of Social Security, | ) Senior United States District Judge |
| | ) |
| Defendant. | ) |

Plaintiff Candace Joy Hicks ("Plaintiff" or "Hicks") brought this action for review of Defendant Carolyn W. Colvin's ("the Commissioner") final decision denying her claim for child's insurance benefits, ("CIB") under Title II of the Social Security Act ("the Act"), as amended, 42 U.S.C. §§ 401-434. This Court has jurisdiction over the action pursuant to 42 U.S.C. § 405(g). Both Hicks and the Commissioner filed motions for summary judgment. ECF Nos. 13, 15. The Court heard argument on the motions at a hearing held on September 30, 2013, and they are now ripe for disposition.

The Administrative Law Judge ("ALJ") in this case concluded that Hicks had the residual functional capacity ("RFC") to perform a limited range of sedentary work with additional restriction including avoidance of even moderate exposure to extreme cold temperatures or cold objects. He also limited her to simple work with limited traveling to unfamiliar places, in order to account for Plaintiff's mental functional limitations. Based on this RFC and other evidence of record, including testimony from a Vocational Expert, the ALJ determined that Plaintiff remained capable of performing work that exists in significant numbers in the national economy

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

1

and thus was not disabled.

In her appeal, Hicks contends that she is entitled to a reversal of the Commissioner's decision—or at least a remand—for three primary reasons. First, she argues that the ALJ improperly assessed her credibility and her complaints of pain and self-reported limitations. Second, she contends that the ALJ erred in finding that she can frequently handle, finger, and feel, and that, without this ability, there is no work that exists in significant numbers that she can perform. Third, and closely related to her second argument, she claims that the ALJ failed to consider or discuss the findings and opinions of one of her treating physicians, Dr. Garry Bayliss, and that those opinions undermine the ALJ's RFC determination.

For the reasons stated below, the Court finds that substantial evidence supports the Commissioner's final decision. Accordingly, the Commissioner's Motion for Summary Judgment, ECF No. 15, is **GRANTED** and Plaintiff's Motion for Summary Judgment, ECF No. 13, is **DENIED**.

I. **STANDARD OF REVIEW**

When reviewing the Commissioner's final decision, the Court is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner reached those findings through application of the correct legal standards. See 42 U.S.C. § 405(g); Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted); Hancock, 667 F.3d at 472. If the Commissioner's determinations are supported by substantial evidence, a reviewing court may not substitute its judgment for the Commissioner's, but instead must defer to those determinations. Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990); 42 U.S.C. § 405(g). Accordingly, "[i]n reviewing for substantial evidence, [this Court does] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ . . . . Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal alterations and citations omitted).

Hicks bears the burden of proving that she is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)(2006)).[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. See 42 U.S.C. §§ 423(d)(2) and 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate a disability claim. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment;[3] (4) can return to her past relevant work; and if not, (5)

---

[2] A claim for Child's Insurance Benefits is analyzed under the same five-step sequential process used to determine disability for purposes of disability insurance benefits and supplemental security income, and the claimant must also have a disability that began before she reached age 22. See, e.g., Reichardt v. Astrue, 2013 WL 461453, at *2 n.4 (D.S.C. Jan. 18, 2013) (citing 20 C.F.R. §§ 404.1520(a)(2), 404.350(a)(5)).

[3] A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a).

whether she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at step five to establish that the claimant maintains the Residual Functioning Capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A.  Procedural Background

Hicks was born on June 13, 1991 and was 21 years old at the time of the ALJ's decision. She protectively filed for child's insurance benefits on April 16, 2009, alleging disability since May 1, 2007. R. 143.[4] As the Commissioner acknowledges, she satisfied the basic eligibility requirements for child's insurance benefits on June 13, 2009, her eighteenth birthday. ECF No. 16 at 2 (citing R. 14). She was found not disabled initially and on reconsideration. R. 82-86, 93-94. At a June 9, 2011 hearing before ALJ Joseph T. Sruton, both Plaintiff (who was represented by counsel) and a vocational expert (VE) testified. See R. 29-58 (transcript from hearing).

The ALJ issued his decision on August 12, 2011, finding that Hicks was not disabled due to her ability to perform sedentary work, with specific additional limitations discussed below. See R. 23; see also generally R. 14-24 (ALJ's decision). In reaching this conclusion, the ALJ properly utilized the five-step process for determining whether a claimant is disabled. See

---

[4] The Administrative Record has been filed at ECF No. 8. Herein, the Court cites to specific pages of the Record as "R. ___."

4

Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520) (setting forth the five steps). The ALJ first determined that Hicks had not yet attained the age of 22 as of the alleged onset date and that she had not engaged in substantial gainful activity since the onset date. R. 16-17. At the second step, the ALJ concluded that Hicks had a number of severe impairments, specifically "Sjogren's syndrome;[5] Raynaud's disease;[6] osteoporosis; status post procedure to correct leg/knee deformity; gonadal dysgenesis;[7] depression; obsessive-compulsive disorder (OCD); attention deficit hyperactivity disorder (ADHD); specialized anxiety disorder; and moderate obesity. R. 16. He further concluded, however, that none of her impairments or combination of impairments met or medically equaled the severity of any listed impairment. R. at 17-18.

Based on the evidence before him, which included records from Drs. Bayliss and Cohen that were submitted after the hearing, see R. 14, the ALJ determined that Hicks had the following residual functional capacity:

> [T]he claimant is able to lift no more than 10 pounds occasionally; stand and/or walk for no more than 2 hours in an 8-hour workday and sit for 6 or more hours total in an 8-hour workday. The

---

[5] Sjogren's syndrome is a condition which can cause dryness in the eyes and mouth, as well as in the skin and the mucous membrane of the nose and throat, and is sometimes associated with Raynaud's disease. See J.E. Schmidt, Attorney's Dictionary of Medicine, at S-172 (1999) (hereinafter "Dict. of Med.").

[6] Raynaud's disease and Raynaud's syndrome both refer to a "disease marked by spasms of the blood vessels in the limbs, especially in the legs, and more often in the toes. During an attack, the affected part aches and feels cold. The spasms are usually initiated by exposure to cold and by emotional strain." Dict. of Med., at R-33, R-34. Some of Plaintiff's medical records and the briefs also occasionally refer to "Raynaud's phenomenon," defined as a "vascular (blood vessel) disorder characterized by intermittent attacks of pallor or cyanosis (bluish discoloration) of the extremities, especially of the fingers or toes . . . usually initiated by emotion or exposure to cold. The phenomenon is observed in patients affected with Raynaud's disease, but it may be the result of other diseases." Id. at R-34.

[7] Gonadyl dysgenesis refers generally to the failure of the gonads (i.e., the gland which produces either the testicles or the ovaries) to develop. Med. Dict. at G-112. Although "gonadal dysgenesis syndrome" attributes the failure to a chromosome disorder, with a chromosome count of 45 with an X or a Y chromosome missing, see id., Hicks's genetic testing revealed a normal female (46 XX) karyotype. R. 258-59.

> claimant can frequently handle, finger and feel objects but cannot
> have constant use of her hands. She can never climb ramps,
> ladders, ropes or scaffolds; or never crawl or kneel. She can rarely
> climb stairs and occasionally stoop or crouch. Additionally, the
> claimant should avoid even moderate exposure to extreme cold
> temperatures and cold objects. Finally, due to her mental
> impairments, the claimant's ability to maintain attention for two
> hours at a time and make simple work-related decisions is limited,
> but [she] is able to perform these functions in a satisfactory
> manner. The claimant is limited in her ability to travel in
> unfamiliar places and is expected to be absent from work less than
> once a month.

R. 18-19. The ALJ relied on the VE's testimony that this RFC would allow Hicks to perform the requirements of occupations such as an assembler, packer, and "inspector, tester, or sorter." All of these occupations are available in substantial numbers in the local and national economies. See R. 23. Accordingly, the ALJ concluded Hicks was not disabled under the Act. Id.

The Appeals Council subsequently denied Hicks's request for review, R. 1-3, rendering the ALJ's decision the final decision of the Commissioner. See 20 C.F.R. § 404.981. Hicks timely filed this Complaint seeking review of the Commissioner's decision.

### B. Medical and Other Evidence

As the Commissioner acknowledges, Hicks has a "complex medical history." ECF No. 16 at 1; see also R. 22 (ALJ acknowledging that Hicks "has a complicated medical history in terms of the diagnoses of Sjogren's disease with Raynaud's phenomenon and gonadal dysgenesis"). In 2007, she was diagnosed with gonadal dysgenesis, R. 309, after a sonogram revealed that she had a small prepubertal uterus, but no identifiable ovaries. R. 257, 335. Because of her lack of ovaries, her body is unable to naturally produce estrogen; thus, she has been on estrogen replacement therapy since May 2007. R. 306. She also was diagnosed in 2007 with osteoporosis, which was deemed by Dr. Adkins, her pediatric endocrinologist, to be "significant" in Hicks's back at the time of diagnosis. R. 308-09. Plaintiff has also had multiple fractures of hands and other limbs because of the osteoporosis. R. 281-83, 285-90, 307. She takes calcium

and Vitamin D supplements and the ALJ noted that follow-up reports indicate she is "doing well" and "experiencing good results" from the estrogen, calcium, and Vitamin D. R. 20.

On March 5, 2010 and December 21, 2010, Hicks was seen by Dr. Nancy Friedman, a pediatric endocrinologist at Duke University Medical Center. R. 334-43. During the second visit, Dr. Friedman noted that Hicks was suffering from a number of symptoms and conditions, including a low white blood cell count, anemia, severe, long-standing constipation, positive ANA; Raynaud's syndrome; slightly elevated blood pressure, a concerning hemoglobin A1C level, significant depression, low Vitamin D levels, questionable glaucoma and ongoing headaches and muscle pains. R. 334-39.

In addition to her other diagnoses, Plaintiff also suffered from "knock knee" or genu valgum. R. 300, 310-11. This condition was treated by surgery in 2007, although Plaintiff continued to complain to her physicians regarding discomfort or pain in her knees, and to convey her difficulties walking and standing. R. 288-89, 296-302, 336.

In early 2009, Dr. Adkins referred Plaintiff to Dr. Rabinovich for an evaluation of her ANA and Raynaud's syndrome.[8] R. 278-79, 300, 309, 450. Dr. Rabinovich opined that the estrogen Hicks was receiving was probably a "contributing factor" to the Raynaud's symptoms of burning pain and numbness in Hicks's fingers. R. 279. On June 24, 2011, Hicks saw Dr. Garry E. Bayliss for a consultative evaluation regarding her Raynaud's syndrome. After his evaluation, Dr. Bayliss diagnosed Hicks with "Sjogren syndrome with associated Raynaud phenomenon" and discussed conservative measures for treating those conditions. R. 450. He also diagnosed her as having polyarthralgias, osteopenia, depression/obsessive-compulsive disorder, and a history of ovarian agenesis." Id. He prescribed her Relafen, an anti-inflammatory, twice per day in place of Advil, ordered that she continue on hormone replacement, and increased her Vitamin D dosage

---

[8] See supra note 6.

to 4000 units daily. He also recommended artificial tears and a humidifier to help with the Sjogren's symptoms, and a calcium supplement. Based on her lab results, Dr. Bayliss wrote a note indicating that the results might indicate she has CREST syndrome,[9] although he also noted an absence of scleroderma, often a primary symptom of CREST. R. 456. He suggested that she get "information on CREST from internet sources" and that she "make an earlier appointment if new problems arise." Id.

Hicks has been diagnosed as suffering from mental impairments, as well. On March 11, 2010, Dr. Murry J. Cohen, M.D. diagnosed Plaintiff with social anxiety disorder, obsessive compulsive disorder ("OCD"), social phobias, and sexual development delay. R. 329-32, 437-49. He prescribed her 5 milligrams per day of Lexapro and directed that she return in a week. On October 20, 2010, Dr. Nancy Bailey, Ph.D. treated plaintiff and identified goals of treatment, which included "anxiety management skills, improve mood, and address family issues." According to her own testimony, Hicks is being treated by both a psychiatrist and a psychologist for anxiety and OCD, and she also described fears related to darkness, being alone, and fears of being kidnapped, which cause her to experience anxiety in new places or situations.[10] R. 42, 46-48.

Despite the medical problems Hicks has endured, she nonetheless graduated from high school and was enrolled at the time of the hearing as a full-time college student at Mary Washington University. The University provides her with various accommodations, both

---

[9] "CREST syndrome" is a form of systemic scleroderma [(hardening, thickening, and excessive pigmentation of the skin, Dict. of Med. at S-61)] marked by . . . deposit of calcium in skin, Raynaud's phenomenon, . . . sluggish gullet, scleroderma of fingers or toes . . . and dilation of small blood vessels." Dict. of Med. at C-495.

[10] There are a number of other medical records related to Plaintiff's mental conditions, and some of them were discussed by the ALJ. Because Plaintiff is not challenging any of the ALJ's reasoning or conclusions related to her mental impairments, the Court does not discuss those records in any detail.

8

academic and in terms of living arrangements.[11] With those accommodations, she has managed to maintain a 2.9 grade point average, live on campus, and to engage in some social activities, such as participating in her hall council, a freshman year Bible study, and a sorority. R. 38-41. She also occasionally goes out to dinner or to a movie with friends. R. 41.

Hicks testified that her prior attempts at working, however, were affected by her medical conditions. For example, she testified that when she worked as a waitress she was required to handle cold beverages. This would cause her hands to go numb, so she was unable to perform this job. R. 51.

As discussed, because of her lack of ovaries Plaintiff is on prescribed estrogen. Despite this, she testified that she experiences hot flashes. R.42. She also testified that she experiences severe neck pain, lower back pain, and knee pain, and that she suffers from tingling and numbness in her hands, which can also become painful. R. 43-45.

After the hearing before the ALJ, but before the ALJ issued his decision, Plaintiff provided additional medical records, including a report and records from Dr. Bayliss in Exhibits 18F and 19F. The ALJ states that he has "reviewed and considered" these records, R. 14, but Plaintiff complains that he does not adequately discuss them in his opinion. See ECF No. 14 at 11 (claiming that the ALJ's decision "makes no mention of the report and opinions" of Dr. Bayliss in Exhibits 18F and 19F").[12] In those records, Dr. Bayliss noted that Hicks has a history of persistent back pain with a history of osteopenia. R. 450. He also diagnosed her as having

---

[11] These include placement in a first-floor, air-conditioned dorm room that is centrally located to all of her classes, as well as her professors letting her leave the room as needed or to stand up and walk around after sitting. She is also given extra time on tests to make up for time she has to physically move around. Hicks also testified that she established her course schedule by spreading out classes and ensuring she had breaks in between to allow her to rest. R. 38, 48.

[12] In fact, although Plaintiff points to some portions of the records not expressly discussed (including the reference to Plaintiff possibly having CREST syndrome), the opinion repeatedly cites to portions of these records when it sets forth Plaintiff's medical history. See R. 20 (including two references each to Exhibits 18F and 19F).

9

Sjogren's syndrome with associated Raynaud's phenomenon involving the hands and feet. R. 450. Based on Hicks's laboratory results, Dr. Bayliss also wrote the note referencing a possible CREST diagnosis, as discussed above. R. 456. According to Plaintiff, this condition can cause a variety of problems with the lungs, as well, and she previously had CT scans showing nodules on her lungs, although those spots were deemed insignificant by her treatment providers. R. 344-46, 353, 359.

## III. DISCUSSION

As noted, Hicks raises three primary arguments in support of her contention that there is not substantial evidence to support the Commissioner's decision. First, she asserts that the ALJ improperly assessed her medical evidence, pain complaints, and credibility. Second, she contends that the ALJ erred in finding that she can frequently handle, finger, and feel, and that this error led to the erroneous conclusion that there is work she can perform. The Court addresses this second argument in conjunction with her third, closely-related claim that the ALJ failed to consider the findings and opinions of Dr. Bayliss, and that his opinions undermine the ALJ's RFC determination.

### A. The ALJ's Assessment of Plaintiff's Pain Complaints and Credibility Is Supported By Substantial Evidence

Plaintiff argues that the ALJ erred in not giving proper credit to her own reports of her limitations and complaints of pain when he determined the RFC. An RFC is an assessment, based upon all of the relevant evidence, of what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 419.945. Descriptions and observations of a claimant's limitations by her and by others must be considered along with medical records to assist the Commissioner in deciding to what extent an impairment keeps a claimant from performing particular work activities. Id.

The ALJ determines the facts and resolves inconsistencies between a claimant's alleged impairments and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Hicks's subjective allegations of disabling symptoms are not conclusive. Rather, the ALJ must examine all of the evidence, including the objective medical record, and determine whether Hicks met her burden of proving that she suffers from an underlying impairment which is reasonably expected to produce her claimed symptoms. Craig v. Chater, 76 F.3d 585, 592-93 (4th Cir. 1996). The ALJ then must evaluate the intensity and persistence of the claimed symptoms and their effect upon Hicks's ability to work. Id. at 594-95.

A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.)

The ALJ's RFC here contained numerous specific restrictions in order to take into account Plaintiff's impairments and physical and mental limitations. As to his assessment of Hicks's credibility, the ALJ explained his credibility determination and the reasons for it in some detail. For example, he pointed to evidence which suggested that Hicks "has not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged . . . ." R. 21. He further noted that at the hearing, Hicks testified that she experiences chronic headaches approximately two times per week, but that the medical records show her as reporting headaches once every three months prior to going to college and once every three weeks after she started college. Id. (citing Exhibit 4F; see R. 325). Thus, he concluded that she "may not be entirely reliable" in terms of her self-reports of

symptoms. Additionally, the ALJ noted that she failed to follow up on certain of her doctor's recommendations and in particular her apparent failure to attend physical therapy as recommended. Id. Finally—and significantly—the ALJ noted that the claimant's allegations of totally disabling symptoms were unsupported by any restriction placed on her by her treating physicians. The only treating sources who recommended any restrictions were Dr. Bailey and Dr. Rabinovich. As to these opinions, the ALJ considered them and found that Dr. Bailey's was entitled to some weight, but that Dr. Rabinovich's—which only imposed a restriction on temperature extremes--was not limited enough and thus was entitled only to little weight. The ALJ also found that the opinions of the state agency consultants (who determined that Hicks was able to perform a range of light exertional work with several additional limitations) were only entitled to some weight, because her RFC is even more limited than those opinions. R. 21-22.

Summing up the justification for his RFC, the ALJ noted that it was supported by "some of the claimant's own subjective allegations, the relatively benign objective findings both prior to and after the alleged onset date, the conservative degree of treatment the claimant has received, and the record as a whole." R. 22.

The ALJ's determination of Hicks's RFC was anything but a knee-jerk reaction to his assessment of Plaintiff's credibility. Instead, the RFC was a reasoned determination that considered all of the functional limitations suggested by any physician in the record, and compared Hicks's claims of disability with the medical evidence, crediting what was supported by the objective medical evidence. See ECF No. 16 at 12-13 (setting forth a bullet point list of evidence that supported the RFC assessment). That evidence includes, for example, that Plaintiff's doctors have stated that she has responded well to the estrogen treatment and that her osteoporosis is largely resolved. R. 268, 270, 272-273, 325-26. Thus, while her gonadyl dysgenesis and osteoporosis may have certain continuing effects, the medical records support a

finding that they are generally well-controlled. Additionally, while Plaintiff reported pain in her knees and elsewhere, she only took Advil, Tylenol, or Relafen, a prescription non-steroidal anti-inflammatory medication. R. 341, 450. She does not regularly take any stronger prescription pain medication. Similarly, as discussed in more detail below, the numbness and tingling in her hands caused by the Raynaud's phenomenon results only from exposure to cold temperatures, R. 404-07, and her muscle strength was otherwise normal. R. 274, 283, 299, 311, 330. The ALJ's RFC accounted for that limitation by limiting her from even moderate exposure to extreme cold. R. 19.

Similarly, as to Plaintiff's claim that she cannot sit long enough to perform sedentary employment, the entirety of the record supports the ALJ's conclusion that Plaintiff can sit for six hours total in an eight-hour work day and perform sedentary work. To the extent Plaintiff claims otherwise, see ECF No. 14 at 15, the Court concludes that substantial evidence supports the ALJ's decision. In particular, while Plaintiff points to the "significant osteoporosis" in her spine, id., that was deemed "significant" at the time of diagnosis, but she has been treated, but the more recent medical records show great improvement with her medicinal regimen. See, e.g., R. 268.

In short, the ALJ did exactly what he was supposed to do. Whether or not the Court would have found the same RFC is immaterial; the Court is tasked only with determining whether there was substantial evidence to support it, and that standard is met here. See 20 C.F.R. §§ 404.1529(c), 416.929(c) ("In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating or nontreating source, or other persons about how your symptoms affect you. We also consider the medical opinions of your treating source and other medical opinions as explained in § 404.1527.").

### B. The ALJ's Assessment that Plaintiff Can Frequently Handle, Finger, and Feel Is Supported By Substantial Evidence and Is Not Contradicted By Dr. Bayliss's Supplemental Records

In addition to making a general challenge to the RFC, Plaintiff challenges, in particular, the ALJ's assessment that, although she cannot use her hands constantly, she can "handle, finger, and feel objects frequently." See R. 18-19; ECF No. 14 at 12-13. She contends that she has no ability to handle, finger, and feel objects frequently, contending instead that she can only occasionally handle, finger, and feel. Based on this, she argues there are no jobs available to her. ECF No. 14 at 12-13 (citing R. 55-56.)

She relies heavily on her argument that the ALJ's failure to discuss in more detail the additional medical records from Dr. Bayliss requires remand for further consideration, at the very least, because it shows he did not evaluate all evidence and opinions in the record. In particular, she posits:

> Dr. Bayliss's findings are significant with regard to not only the plaintiff's complaints of pain but her difficulty in using her hands. The ALJ should have considered the findings and opinions of Dr. Bayliss; given that, Dr. Bayliss's findings may have changed the ALJ's residual functional capacity findings regarding the plaintiff's ability to handle, finger, and feel.

ECF No. 14 at 12.

The Commissioner counters with two basic arguments. First, it argues that Dr. Bayliss's records "contain no opinions on functionality, and thus there was no opinion for the ALJ to address." ECF No. 16 at 14. Second, and more fundamentally, the Commissioner emphasizes that "nothing in Dr. Bayliss's notes, even a diagnosis of CREST syndrome, establish any functional limitations that were not already accounted for in the ALJ's restrictive RFC assessment." Id.

The Court has reviewed the new records from Dr. Bayliss and agrees with the

14

Commissioner that the limitations included in the ALJ's RFC assessment adequately take into account the medical conditions referenced in the additional records. That is, Dr. Bayliss does not offer any opinion in those records as to any specific functional restrictions or limitations. Moreover, even if he had conclusively stated that Hicks had CREST syndrome (albeit without the scleroderma, or the hardening of the skin), that diagnosis alone would not lead to any additional restrictions that are not already accounted for. Additionally, the medical evidence before the Court shows that the potentially-related nodules on Plaintiff's lungs do not require treatment at the time of the report. Indeed, the pulmonologist who reviewed her most recent lung x-rays opined that they were of no clinical importance and no specific follow-up was recommended. R. 345.

For all of these reasons, the Court concludes that substantial evidence supports the Commissioner's final determination that Hicks is not disabled.

## IV. CONCLUSION

The Court has determined that the ALJ's decision is supported by substantial evidence. Therefore, the Court **GRANTS** the Commissioner's Motion for Summary Judgment, ECF No. 15, and **DENIES** the Plaintiff's Motion for Summary Judgment, ECF No. 13.

An appropriate Order shall issue this day.

ENTER: This 20th day of February, 2014.

Hon. James C. Turk
Senior United States District Judge